JS 44C/SDNY
REV. 06/01/17

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Lucien Selce, Drexel, Morgan & Co., Inc. and Fairmont Capital Ltd. | LVMH Moet Hennessy-Louis Vuitton SE, Breakfast Holdings Acquisitions Corp., Breakfast Acquisition Corp., Bernard Arnault, and Jean Jacques Guiony |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Paul Batista, P. C., 26 Broadway, Suite 1900, NY, NY 10004  631 377 0111 | Not Known |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Action for securities fraud pursuant to Section 10(b) of the Securities Exchange Act of 1934

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No [x] Yes [ ]    Judge Previously Assigned

If yes, was this case  Vol.[ ] Invol. [ ]  Dismissed. No [ ]  Yes [ ]  If yes, give date _____ & Case No. _____

IS THIS AN INTERNATIONAL ARBITRATION CASE?      No [x]      Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*      NATURE OF SUIT

**TORTS**

**ACTIONS UNDER STATUTES**

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110  INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | [ ] 422 APPEAL 28 USC 158 | [ ] 375 FALSE CLAIMS |
| [ ] 120  MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | | | | [ ] 376 QUI TAM |
| [ ] 130  MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 365 PERSONAL INJURY/ PRODUCT LIABILITY | [ ] 690 OTHER | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 140  NEGOTIABLE INSTRUMENT | | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | | | [ ] 410 ANTITRUST |
| [ ] 150  RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | **PERSONAL PROPERTY** | **PROPERTY RIGHTS** | | [ ] 430 BANKS & BANKING |
| | [ ] 340 MARINE | | [ ] 820 COPYRIGHTS | | [ ] 450 COMMERCE |
| [ ] 151  MEDICARE ACT | [ ] 345 MARINE PRODUCT LIABILITY | [ ] 370 OTHER FRAUD | [ ] 830 PATENT | | [ ] 460 DEPORTATION |
| [ ] 152  RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION | | [ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | | [ ] 840 TRADEMARK | | [ ] 480 CONSUMER CREDIT |
| [ ] 153  RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | **SOCIAL SECURITY** | | [ ] 490 CABLE/SATELLITE TV |
| | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | **LABOR** | [ ] 861 HIA (1395ff) | [x] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| [ ] 160  STOCKHOLDERS SUITS | | | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 862 BLACK LUNG (923) | |
| [ ] 190  OTHER CONTRACT | | **PRISONER PETITIONS** | [ ] 720 LABOR/MGMT | [ ] 863 DIWC/DIWW (405(g)) | |
| [ ] 195  CONTRACT PRODUCT LIABILITY | | [ ] 463 ALIEN DETAINEE | [ ] 740 RAILWAY LABOR ACT | [ ] 864 SSID TITLE XVI | [ ] 890 OTHER STATUTORY ACTIONS |
| [ ] 196 FRANCHISE | **ACTIONS UNDER STATUTES** | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | [ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA) | [ ] 865 RSI (405(g)) | [ ] 891 AGRICULTURAL ACTS |
| | **CIVIL RIGHTS** | [ ] 530 HABEAS CORPUS | | **FEDERAL TAX SUITS** | |
| **REAL PROPERTY** | | [ ] 535 DEATH PENALTY | [ ] 790 OTHER LABOR LITIGATION | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 893 ENVIRONMENTAL MATTERS |
| [ ] 210  LAND CONDEMNATION | [ ] 440  OTHER CIVIL RIGHTS (Non-Prisoner) | [ ] 540 MANDAMUS & OTHER | [ ] 791 EMPL RET INC SECURITY ACT (ERISA) | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 895 FREEDOM OF INFORMATION ACT |
| [ ] 220  FORECLOSURE | [ ] 441 VOTING | | | | [ ] 896 ARBITRATION |
| [ ] 230  RENT LEASE & EJECTMENT | [ ] 442 EMPLOYMENT | **PRISONER CIVIL RIGHTS** | **IMMIGRATION** | | [ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION |
| [ ] 240  TORTS TO LAND | [ ] 443 HOUSING/ ACCOMMODATIONS | [ ] 550 CIVIL RIGHTS | [ ] 462 NATURALIZATION APPLICATION | | |
| [ ] 245  TORT PRODUCT LIABILITY | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 555 PRISON CONDITION | [ ] 465 OTHER IMMIGRATION ACTIONS | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 290  ALL OTHER REAL PROPERTY | [ ] 446  AMERICANS WITH DISABILITIES -OTHER | [ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT | | | |
| | [ ] 448 EDUCATION | | | | |

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE _____    DOCKET NUMBER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [x] YES [ ] NO

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

(PLACE AN  x  IN ONE BOX ONLY)

**ORIGIN**

[X] 1 Original
Proceeding

[ ] 2 Removed from
State Court

[ ] 3 Remanded
from
Appellate
Court

[ ] 4 Reinstated or
Reopened

[ ] 5 Transferred from
(Specify District)

[ ] 6 Multidistrict
Litigation
(Transferred)

[ ] 7 Appeal to District
Judge from
Magistrate Judge

[ ] a. all parties represented

[ ] 8 Multidistrict Litigation (Direct File)

[ ] b. At least one party
is pro se.

(PLACE AN  x  IN ONE BOX ONLY)

**BASIS OF JURISDICTION**

*IF DIVERSITY, INDICATE
CITIZENSHIP BELOW.*

[ ] 1 U.S. PLAINTIFF

[ ] 2 U.S. DEFENDANT

[X] 3 FEDERAL QUESTION
(U.S. NOT A PARTY)

[ ] 4 DIVERSITY

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN
THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

**COURTHOUSE ASSIGNMENT**
I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21.

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   [ ] WHITE PLAINS   [X] MANHATTAN

DATE 9/28/20    SIGNATURE OF ATTORNEY OF RECORD

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[X] YES (DATE ADMITTED Mo. March    Yr. 1975    )
Attorney Bar Code # PB8717

RECEIPT #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Lucien Selce, Drexel, Morgan & Co., Inc. and Fairmont Capital Ltd | Plaintiff, |
| **-v-** | |
| LVMH Moet Hennessy-Louis Vuitton SE, Breakfast Holdings Acquisition Corp., Breakfast Acquisitions Corp., Bernard | Defendant. |

Case No._____

**Rule 7.1 Statement**

Pursuant to Federal Rule of Civil Procedure 7.1 [formerly Local General Rule 1.9] and to enable District Judges and Magistrate Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel for

_____ (a private non-governmental party)

certifies that the following are corporate parents, affiliates and/or subsidiaries of said party, which are publicly held.

None

**Date:** September 28, 2020 _____

_____
**Signature of Attorney**

**Attorney Bar Code:** PB8717 _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

LUCIEN SELCE; DREXEL, MORGAN & CO., INC.;
and FAIRMONT CAPITAL LTD,                           :    20 Civ. [          ]

                          Plaintiffs,               :

         – against –                                :

LVMH MOËT HENNESSY-LOUIS VUITTON SE;                :
BREAKFAST HOLDINGS ACQUISITION CORP.,
a Delaware corporation; BREAKFAST                   :    **JURY TRIAL DEMANDED**
ACQUISITION CORP., a Delaware corporation;
BERNARD ARNAULT and JEAN JACQUES                    :
GUIONY,
                                                    :
                          Defendants.
                                                    :
-------------------------------------------------------------------------x

## **COMPLAINT**

Lucien Selce, Drexel, Morgan & Co., Inc., and Fairmont Capital Ltd., by and through their attorney, Paul Batista, P.C., as and for their Complaint against LVMH Moët Hennessy-Louis Vuitton SE, Breakfast Holdings Acquisition Corp., Breakfast Acquisition Corp., Bernard Arnault and Jean Jacques Guiony respectfully allege as follows:

### **Introduction and Summary**

1. This is an action principally for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] in which three investors – Mr. Lucien Selce, Drexel, Morgan & Co., Inc. ("Drexel") and Fairmont Capital Ltd. ("Fairmont") – purchased on public exchanges registered with the United States Securities and Exchange Commission and other government-approved exchanges securities of Tiffany & Co. ("Tiffany") as a result of plaintiffs' reliance on

1

the contractual obligations under a highly publicized November 24, 2019 Merger Agreement (the "Merger Agreement") and public statements of defendants LVMH Moët Hennessy-Louis Vuitton SE ("LVMH"); Breakfast Holdings Acquisition Corp. ("BHAC"), a Delaware corporation; and Breakfast Acquisition Corp. ("BAC").

2. Also named as defendants are Bernard Arnault ("Arnault"), the Chief Executive Officer of LVMH, and Jean Jacques Guiony ("Guiony"), the Chief Financial Officer of LVMH, as control persons of LVMH liable under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

3. The Merger Agreement was executed after an aggressive and unsolicited pursuit of Tiffany, the celebrated American retailer, by LVMH, a perennial acquirer of luxury products businesses. In a whirlwind of publicity generated in a short period of time by LVMH, Arnault, and Guiony, Tiffany agreed to LVMH's acquisition proposal in the wake of defendants' increasing their unsolicited bid five times, including three price increases during a single day. LVMH insisted that it and its counsel had extensively reviewed the two businesses, and assured Tiffany and the investing public, including plaintiffs, that the transaction posed no antitrust risk anywhere in the world. Defendants also asserted that they did "not foresee any impediments to a successful and timely closing of [the] transaction."

4. Given the intensity of LVMH's desire to acquire the legendary Tiffany brand, defendants agreed after just four days of negotiation to the Merger Agreement, which was highly favorable to Tiffany.

5. As investors, plaintiffs carefully followed the developments regarding the transaction, including a cascade of affirmative and positive information disseminated by LVMH, Arnault, and Guiony. Plaintiffs had absolutely no inside, non-public information before purchasing

substantial amounts of Tiffany securities in reliance solely on defendants' public statements and the terms of the Merger Agreement.

6. As described more fully later in this Complaint, plaintiffs, in reliance on the Merger Agreement *and* statements made by defendants, including principally Arnault and Guiony, have since November 2019 sustained millions of dollars in damages as a result of LVMH's illegal renunciation of the Merger Agreement.

7. Under the Merger Agreement, defendants assumed all antitrust-clearance risk through an iron-clad "hell-or-high-water" clause. Defendants also assumed all financial risk related to adverse industry trends or economic conditions. In making their investment decisions regarding Tiffany's securities, plaintiffs relied on the commitments made by defendants in the Merger Agreement and defendants' public statements since the Merger Agreement was executed.

8. Despite unequivocally assuming these risks in the Merger Agreement, defendants have taken an array of acts, and have failed to act, in attempting to evade their obligations by (i) breaching their express contractual promise to "do or cause to be done all things, necessary or advisable" to secure antitrust clearances "as promptly as practicable," and (ii) wrongly asserting that recent pandemic-related effects on the global economy and social-justice protests in the United States somehow have given defendants the unilateral right to void the transaction.

9. Among the factors influencing plaintiffs' purchasing decisions was the provision in the agreement requiring defendants to prepare and file, "as promptly as practicable," all antitrust-clearance applications and to obtain, "as promptly as practicable," all antitrust clearances. Despite this express contractual obligation, defendants have engaged in protracted campaigns of delay in obtaining crucial antitrust approvals in vital jurisdictions.

10. After their initial insistence that the transaction posed no antitrust risk—and their express assumption in the Merger Agreement of any and all risk of adverse clearance outcomes through the hell-or-high-water clause – defendants have refused to initiate, pursue and obtain requisite approvals in numerous important jurisdictions and have delayed the antitrust-clearance process for more than nine months in other jurisdictions.

11. Recognizing that their very own antitrust analyses confirmed that approvals for the deal were inevitable and having in fact quickly obtained antitrust-approval in the United States more than seven months ago, defendants have for months stalled, delayed and subverted the process of obtaining other approvals. These concerted delays flagrantly violate the agreed-upon contractual obligations, and are a transparent attempt to void the Merger Agreement or to extract from Tiffany such substantial price reductions as to eliminate by millions of dollars the proceeds plaintiffs would have received from sales of Tiffany securities and other equity interests in Tiffany obtained by plaintiffs.

12. Significantly, LVMH failed even to file its requests for approvals in several crucial jurisdictions before the initial August 24, 2020 "drop-dead" date in the Merger Agreement, which both parties had selected at signing in November 2019 as a date that would provide more than ample time to obtain all necessary clearances and complete the transaction.

13. After delaying the antitrust-clearance processes, defendants have taken the pretextual position that the global economic downturn incident to the COVID-19 pandemic qualifies as a "material adverse effect" ("MAE") under the Merger Agreement. No such MAE has taken place and, as alleged in greater detail later in this Complaint, defendants have no legitimate basis for arbitrarily voiding the Merger Agreement.

14. Defendants' justifications for aborting the transaction are all baseless. LVMH has cited no decline specific to Tiffany's business, but instead relies only on an industry-wide downturn throughout the entire luxury-goods sector. Even then, LVMH points only to quarter-to-quarter declines among luxury-goods retailers, including LVMH itself, but offers not even a suggestion of any industry declines of significant duration, much less material declines unique to Tiffany—the only relevant consideration under the Merger Agreement. In fact, updated forecasts provided by Tiffany to LVMH in August 2020 at LVMH's insistence project that Tiffany's earnings for the fourth quarter of 2020 will be *greater than the same period in 2019,* demonstrating a rapid return to, and surpassing of, Tiffany's pre-pandemic performance.

15. In an outrageous gambit, LVMH, one of France's most powerful and influential corporations, has repeatedly sought to have the French government intervene on LVMH's behalf to negate and nullify the Merger Agreement. Among other things, *The Wall Street Journal* in its September 17, 2020 edition contained an article entitled *LVMH Sought French Government Help in Dropping Tiffany Takeover.* The article summarized LVMH's attempt to exercise LVMH's gross abuse of power.

> LVMH . . . asked the top negotiator in France's tax talks with the U.S. for help in backing out of its agreement to take over Tiffany & Co., and was turned down, according to senior French officials.
>
> Such outreach, to French Finance Minister Bruno Le Maire, adds a new wrinkle to the luxury conglomerate's account of why it ended its $16.2 billion planned acquisition of Tiffany – specifically [LVMH's] contention that the French government was the driving force in its decision . . . .
>
> Last week, LVMH said it was forced to abandon the deal after receiving a letter from a different French official, Foreign Minister Jean-Yves Le Drian, that the luxury-goods company said was unsolicited and legally binding. The letter, dated August 31, said LVMH should delay purchase of Tiffany until January, saying the move would strengthen France's hand in tax and trade negotiations with the U.S. . . .

French officials said LVMH reached out to Mr. Le Maire about the Tiffany acquisition before Mr. Le Drian sent his letter. [LVMH] . . . asked Mr. Le Maire to write a letter laying the grounds for LVMH to re-negotiate or pull out of the merger agreement, the French officials said.

Mr. Le Maire refused [LVMH's request], the officials said . . .

French officials close to the negotiation said they didn't view the deal for Tiffany as a potential bargaining chip, because the [Tiffany] acquisition was irrelevant to the talks.

[Guiony], LVMH's chief financial officer, denied that the company solicited Mr. Le Drian's letter from the government. "Are you seriously suggesting that we [LVMH] procured the letter?" Mr. Guiony told reporters. "I don't even want to answer that question."

Bloomberg previously reported LVMH had asked for help from the French government in pulling out of the deal.

Mr. Le Maire didn't coordinate with Mr. Le Drian regarding LVMH's request for help, the French officials said. The officials said they were stunned by Mr. Le Drian's letter, because the foreign minister didn't have a direct role in the tax talks [between France and the United States].

Tiffany filed a lawsuit against LVMH in the Delaware Chancery Court, saying that Mr. Le Drian's letter was a pretext for LVMH to back out of the deal.

16. Other recent press reports reveal the chicanery, deception and brinksmanship of all defendants, particularly with respect to defendant Arnault. Dow Jones reported on September 22, 2020 that:

French Foreign Minister . . . Le Drian said he was responding to a query from [LVMH] when Le Drian wrote a letter to the luxury conglomerate asking it to delay its acquisition of Tiffany & Co.

LVMH has blamed its decision to back out of its $16 billion takeover of Tiffany on Mr. Le Drian's letter, saying it was an unsolicited and legally binding government order that blocks the conglomerate from fulfilling the merger agreement.

Appearing before Parliament on Tuesday, Mr. Le Drian said the letter resulted from a request the luxury company made for government advice, *a remark that calls into question earlier statements by LVMH.*

Aurélien Pradié, a lawmaker, asked Mr. Le Drian why he sent the letter, which was addressed to Bernard Arnault, LVMH's chief executive and controlling shareholder. "*You flew to the aid of his board of directors with no legal basis, no solid argument*," Mr. Pradié said.

Mr. Le Drian's letter, dated August 31, said LVMH should delay its purchase of Tiffany until Jan. 6. The delay would strengthen France's hand in tax and trade negotiations with the U.S., Mr. Le Drian wrote. That would be more than a month after the deadline stipulated in the merger for completing the agreement.

Before Mr. Le Drian sent his letter, LVMH also approached the finance minister . . . for help in backing out of its agreement to take over Tiffany . . . .

After LVMH announced it was pulling out of the deal, Jean Jacques Guiony, the company's chief financial officer, said Mr. Le Drian's letter came as a "total surprise." [Emphasis supplied.]

17. Moreover, LVMH cannot claim that an MAE has occurred because Tiffany over its last two quarters has not met the projections that were exchanged before the Merger Agreement was signed. The Merger Agreement specifically disclaims any agreement as to those projections and makes clear that a failure to meet those projections cannot form the basis of an MAE.

18. LVMH's assertion of an MAE is simply one of LVMH's pretextual excuses to avoid its obligations under the Merger Agreement. LVMH has made clear that its real goal is to attempt to renegotiate the merger price to which the parties agreed in November 2019 and, barring renegotiation, orchestrate the collapse of the deal. Indeed, the very fact that LVMH has misused the still-pending regulatory approvals as a negotiating tool demonstrates that the regulatory applications pose no genuine impediment to closing. On September 8, 2020, LVMH laid bare these improper tactics when it informed Tiffany that LVMH would refuse to close the transaction before the drop-dead date – even if all outstanding regulatory approvals were received – supposedly in deference to a letter LVMH had

received more than a week earlier from a French politician requesting LVMH to defer closing until after January 6, 2021 in support of a trade dispute between France and the United States.

19. Many factors attributable solely to defendants' statements and their course of conduct led to plaintiffs' purchase of millions of dollars worth of Tiffany securities and other equity vehicles. Among other things, plaintiffs knew that LVMH consistently proclaimed itself the world's largest luxury-goods conglomerate and a serial acquirer of luxury-goods brands. Motivated by Arnault, the head of LVMH, on October 15, 2019, LVMH approached Tiffany with an unsolicited acquisition bid, and then aggressively pursued the transaction, bidding against itself through five price increases. After LVMH conducted just five days of due diligence, the parties negotiated the Merger Agreement over the span of only four days, a testament to LVMH's enthusiasm for the transaction. LVMH and Tiffany ultimately agreed to a merger that valued Tiffany at $16.2 billion. Plaintiffs obviously relied on LVMH's statements about itself and the magnitude of the Merger Agreement's price

20. The carefully crafted Merger Agreement places any risk related to antitrust clearance squarely on LVMH, requires LVMH to "do or cause to be done all things necessary or advisable" to secure antitrust clearances "as promptly as practicable," gives LVMH no unilateral option to walk away from the transaction before the "drop-dead" date and contains a narrow MAE clause giving LVMH a right to abort the transaction only in exceedingly limited circumstances not remotely present here.

21. For several months after signing, LVMH enthusiastically supported the transaction and sought to close as quickly as possible – even sooner than the "middle of 2020" timeline LVMH announced when the Merger Agreement was signed. In December 2019, LVMH announced that it was seeking to obtain "all clearances ASAP and in any event in 2020." At that

8

time, LVMH proposed in a timeline that it shared with the European Commission (the "EC"), the merger review authority in the European Union, that LVMH would file the final merger-notification form with the EC by the end of February 2020, only three months after signing. LVMH also insisted that the parties accelerate schedules for antitrust approval in the United States and for Tiffany's stockholder approval, which were received on February 3 and February 4, 2020, respectively. The parties projected a second quarter 2020 closing.

22. In February 2020, LVMH announced that it had successfully raised more than $10 billion to help pay for the Tiffany acquisition, even though obtaining financing was not a condition of the transaction. Taking advantage of drastically cheaper interest rates resulting from COVID-19-related stimulus packages implemented in February 2020 in the EU, LVMH was able to borrow much of that cash at negative interest rates – in other words, investors have paid LVMH to hold that debt since February.

23. In March 2020, as the effects of COVID-19 began to spread through Europe and reached the United States, LVMH again initially sought to exploit the market disruption for its own economic benefit. After Tiffany's stock price endured a short pandemic-induced price decline in March 2020, LVMH asked Tiffany to waive a standstill provision in the parties' confidentiality agreement (the "Confidentiality Agreement") so that LVMH could begin purchasing Tiffany stock in the open market at a substantial discount to the agreed-upon merger price.

24. As the pandemic continued to unfold, LVMH began to display dissatisfaction with compliance with defendants' own obligations under the Merger Agreement. After rumors surfaced of LVMH's plans to purchase Tiffany stock on the open market exchanges – and after Tiffany explained to LVMH that any waiver would have to be disclosed publicly – LVMH issued a press release on March 23, 2020 stating that "[t]hese

9

rumors [led] LVMH to" remember that it was "currently committed" not to buy Tiffany stock in the open market.

25. As the pandemic continued to spread across the globe, LVMH at first acknowledged publicly that it had no choice but to complete the Tiffany acquisition, telling its investors in April 2020 that LVMH "will stick to the contract, full stop."[1] Soon after the end of Tiffany's first fiscal quarter on April 30, 2020, however, defendants adopted a different corporate strategy to evade through any means possible defendants' obligations under the Merger Agreement or to force Tiffany to agree to a drastic price cut.

26. Indeed, by the beginning of June 2020, LVMH's Managing Director cut off all informal communications with Tiffany's Chairman. This change in corporate strategy was blessed at a June 2020 meeting of LVMH's Board of Directors. At that meeting, which was followed immediately by a detailed leak of the Board's discussions to the press (in itself a violation of the Merger Agreement), LVMH's Board reportedly sent a "clear message" to management that "the acquisition should be reconsidered" and that LVMH should press Tiffany to agree to a reduced merger price.

27. Rather than deny these press reports after its Board meeting, LVMH issued a press release containing the intentionally obscure statement that LVMH's Board met to discuss "the development of the pandemic and its potential impact on the results and perspectives of Tiffany & Co with respect to the agreement that links the two groups." In other words, the binding Merger Agreement that LVMH had ruthlessly sought in November 2019 and in April 2020 had pledged to honor "full stop" was by June dismissed merely as "the agreement that

---

[1] Joelle Diderich, *LVMH Sees Sharp Rebound in China After 15% Q1 Sales Drop,* WOMEN'S WEAR DAILY (April 16, 2020), https://wwd.com/business-news_financial_/lvmh-sales-drop-15-percent-in-first-quarter-due-to-coronavirus-impact-120356237/.

links the two groups." LVMH then proceeded to seek to sever those "links" through multiple deceitful strategies.

28. By the time LVMH settled on its new corporate strategy, antitrust approval in the United States and Tiffany stockholder approval had long ago been received, and there were no material obstacles to closing other than the remaining antitrust clearances, none of which was expected to raise any substantive issues and all of which were expected to be received by mid-summer. Indeed, LVMH understood from its own antitrust analyses that the remaining antitrust approvals were inevitable because, as defendants' own analyses indicated, the deal posed no material antitrust risk. In the face of this knowledge, its Board's directive and the resulting change in corporate strategy, LVMH recognized that (1) that it had absolutely no hope of any legitimate way to sabotage the deal and (2) that the merger-clearance process could serve only to make the deal even less palatable to LVMH because of the hell-or-high-water provision obligating LVMH to accept whatever changes or conditions are necessary to facilitate clearances. As LVMH realized, this meant that LVMH's only potential way out of the deal was not to seek approval at all – or at least not "as promptly as practicable" as required by the Merger Agreement.

29. As just one example, LVMH took more than three months to respond to the EC's first request for information ("RFI"), a relatively straightforward initial "list of clarification questions" that should have taken a diligent party acting "as promptly as practicable"– as defendants were required to do – only a few weeks to address. Throughout the clearance process, LVMH has failed to meet its own proposed deadlines, agreed to and then again failed to meet revised deadlines (even when the deadlines were proposed by LVMH's counsel) and eventually refused even to try to set deadlines. Continuing its evasive measures, in early September 2020 LVMH refused Tiffany's request to schedule additional status calls to discuss LVMH's progress

– or lack of progress – on pending clearance proceedings. This history belies any claim by LVMH that it was "do[ing] or caus[ing] to be done all things, necessary or advisable" to secure antitrust clearances "as promptly as practicable."

30. Over Tiffany's repeated protests, LVMH continuously declared itself incapable of acting with any greater speed because of its "decentralized" business structure and related inefficiencies exacerbated by the COVID-19 pandemic. But LVMH's structure did not inhibit LVMH during the period when it was motivated to pursue this transaction, or when LVMH was in the same period completing other major acquisitions, many of which received all required regulatory approvals in just a few months.

31. Likewise, although French regulators granted French companies a one-month extension of the time to file their half-year reports in light of the COVID-19 pandemic, LVMH was able to meet *that* filing deadline without an extension, filing its 2020 first-half report on July 27, 2020—just one business day later than LVMH had filed its first-half report in 2019. Indeed, LVMH and its businesses have proclaimed their accomplishments during the COVID-19 pandemic, with one of LVMH's largest businesses announcing that, in the months since March 2020, it had not only designed and introduced a new watch collection, but also coordinated with other brands to organize a pan-European luxury watch conference. Yet despite all of this, LVMH's COVID-19-related excuses for its regulatory failures persisted, if not intensified, even after Europe began reopening, presumably in deference to the LVMH Board's June 2020 directive to find a way to escape or renegotiate the Merger Agreement.

32. By any measure, LVMH's inexcusable delays have breached its obligations under the Merger Agreement. Neither the pandemic nor hindsight regret provides a lawful basis for LVMH to try to escape its contractual obligations. Shortly after the Merger Agreement was

12

signed, LVMH stated that it expected to complete the EC filing by February 2020 and to have secured all regulatory approvals by the second quarter of 2020. Thus, even though the Merger Agreement clearly allocates the antitrust clearance risk to LVMH, LVMH has tried to manufacture a non-existent termination right by refusing to seek timely clearance from antitrust regulators, in flagrant breach of the Merger Agreement.

33. In stark contrast to LVMH's long-term deceits, Tiffany has diligently performed its obligations under the Merger Agreement. Tiffany exercised its unilateral right under the Merger Agreement to extend the initial August 24, 2020 "drop-dead" date to November 24, 2020—an action necessitated by LVMH's extreme delays in responding to requests for information from various government authorities and in making the necessary filings to obtain antitrust clearances. In response, LVMH asserted a right to "challenge the validity of Tiffany's extension of the Outside Date" and has invented a non-existent right to terminate the Merger Agreement. LVMH has recently expressed the view that an MAE had occurred which, in its view, would prohibit Tiffany from extending the drop-dead date to November 24 and would as a consequence give LVMH a termination right as of August 25, since the regulatory approvals were not fully obtained by August 24. LVMH also strongly implied that it would, however, be willing to close the transaction if Tiffany agrees to a reduction in the merger price. LVMH's position is a blatant exercise in deceit. No event has occurred that possibly could qualify as an MAE under the Merger Agreement.

34. Obviously desperate for any pretext to avoid its obligations, LVMH has, as previously alleged in this Complaint, attempted to recruit French political and government figures to generate yet another excuse for collapsing the Merger Agreement. For example, on September 8, 2020, LVMH for the first time disclosed that it had received a letter dated August 31, 2020 –

eight days earlier – from the French Ministry for Europe and Foreign Affairs. According to a purported English translation provided by LVMH, the letter allegedly states that the Ministry is opposed to certain tariffs on French goods that the U.S. government announced on July 10, 2020 (but deferred until January 6, 2021) and suggests that LVMH "should defer the closing of the pending Tiffany transaction until January 6, 2021" to support France's intention to "take measures in order to dissuade the American authorities from putting these tariff sanctions into effect."

35. LVMH has admitted that Arnault already has met with French officials to discuss the letter—a clear breach of LVMH's obligation to consult Tiffany in advance of any discussions with governmental entities—and stated that notwithstanding the express language of the Merger Agreement, LVMH intended to comply with the Ministry's request not to close the transaction before January 6, 2021. LVMH further stated that because of its false and fabricated view that an MAE had occurred and that Tiffany has not operated its business in accordance with the Merger Agreement—a claim never before raised by LVMH—LVMH also is unwilling to extend the Outside Date beyond November 24, 2020 (or at least is unwilling to do so unless Tiffany agrees to a reduced merger price). These statements have laid bare that LVMH is unwilling to comply with its obligations under the Merger Agreement, thus inflicting damages on Mr. Selce and the other two plaintiffs by artificially reducing the value of Tiffany stock.

## Parties

36. Defendant LVMH is a *societas Europaea* (European company). LVMH is the world's largest luxury-goods conglomerate. Its headquarters are in France and it operates several significant retail stores in Manhattan alone, as well as in multiple other locations in the United States. LVMH is a sophisticated and experienced player in the world of mergers and acquisitions, with a market capitalization of more than $210 billion as of December 31, 2019. LVMH's

14

Chairman and Chief Executive Officer is defendant Arnault. Its Chief Financial Officer is defendant Guiony.

37. Defendant BHAC is a Delaware corporation and a wholly owned subsidiary of LVMH that was formed solely for the purpose of engaging in the transaction contemplated by the Merger Agreement.

38. Defendant BAC is a Delaware corporation that was formed solely for the purpose of engaging in the transaction contemplated in the Merger Agreement. BAC, a wholly owned subsidiary of defendant BHAC, will merge with and into Tiffany, with Tiffany as the surviving corporation.

39. Mr. Selce is an investor and French citizen.

40. Plaintiffs Drexel and Fairmont are both in the investment business.

### Jurisdiction and Venue

41. This Court has jurisdiction over the claims advanced in this Complaint pursuant to Section 27 of the Exchange Act because the claims arise under Section 10(b) and Section 20(a) of the Exchange Act.

42. Venue is proper in this District since LVMH engages in a wide array of commercial activity in New York City.

15

## Statement of Facts

A.    *LVMH's Relentless Pursuit of Tiffany*

43. Under Arnault's leadership, LVMH has been a serial acquirer of luxury consumer businesses with vast experience in collecting high-status brands. As a result, LVMH is fully familiar with the complex regulatory requirements that govern major international mergers and acquisitions. In 2019, LVMH turned its attention to Tiffany, the iconic American luxury retailer.

44. Upon information and belief, Arnault had a long and close relationship with Francesco Trapani ("Trapani"), one of Tiffany's directors at the time LVMH made its unsolicited offer. Trapani is the great grandson of the founder of the jewelry brand Bulgari and was the CEO of Bulgari when it agreed to be acquired by LVMH in 2011. Trapani served as Chairman and CEO of LVMH's Watches and Jewelry Division from 2011 through 2014, on LVMH's Board of Directors from 2011 through 2016 and as an advisor to Arnault from 2014 through 2016.

45. The dates of meetings of Tiffany's Board of Directors are not publicly disclosed, and are generally known only to Tiffany's directors and the top management of Tiffany. On October 15, 2019, one day before Tiffany's previously-scheduled October 2019 Board meetings, LVMH approached Tiffany with an unsolicited bid to acquire Tiffany for $120 per share, in a deal that would have valued Tiffany at approximately $14.4 billion. This overture, as with numerous other aspects of LVMH's interest in Tiffany, was promptly and strategically leaked to the press and came to the attention of plaintiffs Mr. Selce, Drexel and Fairmont through public media sources.

46. Given that LVMH's bid for Tiffany was unsolicited—and thus there was no particular time pressure or deadline for LVMH to make its bid—LVMH had ample opportunities to evaluate the advantages and potential pitfalls of the acquisition before making

its approach. From the outset and throughout the parties' discussions, LVMH made clear to Tiffany that LVMH already had evaluated the risk related to antitrust approvals and had concluded that antitrust approvals would be granted. LVMH's initial October 15, 2019 unsolicited offer proclaimed the work LVMH and its advisors already had done reviewing competition issues:

> Our proposal provides certainty with minimal conditionality . . . [W]e are confident that the transaction would receive all necessary regulatory approvals including anti-trust clearance, and we do not foresee any impediments to a successful and timely closing of a transaction.

47. LVMH reiterated these points throughout the parties' negotiations, stating that it had been studying the potential acquisition in consultation with its advisors for some time and repeatedly assuring Tiffany that there was no antitrust risk.

48. Tiffany's Board retained counsel to interview Trapani and other Tiffany executives with prior connections to LVMH to evaluate any potential conflicts of interest. On October 16, 2019, the first day of Tiffany's October 2019 Board meetings, defendants' counsel discussed the matter with Trapani. Tiffany advised Trapani that he would not be indemnified in his role as director in the event that he breached his duty of loyalty to Tiffany. Trapani and Tiffany agreed that Trapani should be recused from the discussions of the potential LVMH transaction, and Trapani was in fact excluded from those discussions. Trapani ultimately resigned from Tiffany's Board on November 26, 2019, within days after the Merger Agreement was executed.

49. Tiffany was aware of Arnault's reputation and his ruthless approach to acquisitions. In considering LVMH's bid, Tiffany wanted to ensure that any potential merger agreement would include protections for Tiffany and its stockholders. Accordingly, Tiffany made clear to LVMH that Tiffany and its stockholders (including, of course, Mr. Selce, Drexel and Fairmont) would not assume any antitrust risk at all – particularly given LVMH's initial insistence

17

on moving quickly to close the transaction. Tiffany thus demanded that LVMH assume all antitrust risk through the iron-clad clause placing the burden entirely on LVMH to agree to whatever concessions, divestitures, restrictions or other changes were necessary to secure the required antitrust approvals. Indeed, this was one of the last remaining points of negotiation between the parties, to which LVMH finally agreed on the day the Merger Agreement was signed.

50. LVMH also agreed to a requirement that the merger be completed by August 24, 2020, with either side having the unilateral right to extend that "drop-dead" date by three months to November 24, 2020 in the event that regulatory approvals had not yet been obtained but that the other merger conditions had been satisfied (the "Outside Date"). At the time the Merger Agreement was signed, the parties expected to close the transaction by the middle of 2020. As a result, this date, if extended by three months, afforded the parties more than sufficient time to obtain the requisite antitrust approvals and provided LVMH ample time to agree to and implement any measures required under the hell-or-high-water clause to secure the approvals.

51. Tiffany's Board of Directors also was focused on ensuring that the Merger Agreement did not give LVMH an option to walk away from the transaction, and LVMH acceded to that demand as well. LVMH understood that by agreeing to these terms in the Merger Agreement, defendants essentially obligated themselves irretrievably to complete the acquisition at the agreed-upon price.

52. LVMH pressed aggressively through the negotiations, with LVMH increasing its offer to $125 per share on November 6 and increasing it again to $130 per share on November 11. On November 19, Tiffany and LVMH signed the Confidentiality Agreement, and Tiffany granted LVMH access to documents to conduct its due-diligence

process. Although it has taken LVMH more than nine months after signing the Merger Agreement to prepare the required regulatory filings in multiple jurisdictions – to the extent they have been filed at all – LVMH completed the entirety of its due diligence on a more than $16 billion acquisition in fewer than five calendar days.

53. LVMH sent Tiffany a first draft of a proposed merger agreement on November 20, and – following a series of price increases by LVMH – the parties executed the Merger Agreement on November 24, 2019. Under the Merger Agreement, LVMH agreed to acquire Tiffany for $135 per share in cash, in a transaction that valued Tiffany at approximately $16.2 billion.

54. On November 25, 2019, the day after the parties signed the Merger Agreement, LVMH issued a press release celebrating the addition of Tiffany to its portfolio of brands, praising Tiffany's "unparalleled heritage and unique position in the global jewelry world" and boasting that "[t]he acquisition of Tiffany will strengthen LVMH's position in jewelry and further increase its presence in the United States."

55. Arnault recognized that the Tiffany deal was a long-term investment, stating that LVMH would "develop this jewel with the same dedication and commitment that we have applied to each and every one of our *Maisons"* (a term that LVMH uses to refer to its brands) and that he looked forward "to ensuring that Tiffany continues to thrive for centuries to come." Yet just a few months later, Arnault determined to renege on or seek to renegotiate LVMH's "centuries"-long investment.

56. Tellingly, LVMH's initial public announcements also represented that "[t]he transaction is expected to close in the middle of 2020 and is subject to customary closing conditions[.]"

*B. The Merger Agreement's Allocation of All Antitrust Risk to LVMH and*
*the Severe Limitations on Options to Terminate*

      57. Tiffany and LVMH negotiated a Merger Agreement that allocates significant risk to LVMH, with virtually no options for LVMH to terminate. With respect to antitrust clearance, LVMH agreed to bear all risk, including agreeing to any and all divestitures or business restrictions required by regulators as conditions to clearance. LVMH further agreed to a narrowly defined MAE clause that explicitly excludes from the definition of an MAE general economic and other conditions, unless those conditions have had a materially disproportionate impact on Tiffany as compared to the industries and regions in which Tiffany operates. The Merger Agreement also contains very limited termination rights, and in particular contains no provision allowing LVMH to abandon the deal in the absence of a material breach by Tiffany.

    *1. LVMH's Obligation to "Do or Cause to Be Done All Things, Necessary or Advisable"*
      *to Obtain Antitrust Clearance "as Promptly as Practicable."*

      58. As previously alleged, the Merger Agreement obligates LVMH to "do or cause to be done all things, necessary or advisable" to obtain all required regulatory approvals "as promptly as practicable." Section 7.3(b)(i) requires both parties to:

> cooperate with each other and use . . . their respective reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary or advisable on its part under this agreement and applicable Laws to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable after the date of this Agreement, including (A) preparing and filing, in consultation with the other, as promptly as practicable with any Governmental Entity, documentation to effect all necessary notices, reports, consents, registrations, approvals, permits, authorizations, expirations of waiting periods and other filings, and (B) obtaining as promptly as practicable after the date of this Agreement all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any Governmental Entity, including the Company Approvals and the

Parent Approvals, in order to consummate the transactions contemplated by this Agreement.

59. LVMH also agreed to the hell-or-high-water clause making clear that, in connection with "obtaining clearance under any applicable Antitrust Laws," LVMH's obligations required defendants to use "reasonable best efforts" to "do or cause to be done all things, necessary or advisable" to obtain, "as promptly as practicable," all required regulatory approvals. This "reasonable best efforts" requirement imposed on LVMH obligations to take all reasonable steps to solve problems and consummate the transaction. LVMH also was required to agree to any and all divestitures or business restraints as necessary "so as to enable . . . the Closing to occur no later than the Outside Date." This meant that LVMH bore 100% of any antitrust risk – something that LVMH would not have accepted had it believed that the transaction involved meaningful antitrust risk.

60. Section 7.3 of the Merger Agreement grants LVMH the authority to "direct and implement (or direct the implementation by [Tiffany] of) the regulatory strategy"' but also requires LVMH to consult with Tiffany and to consider in good faith Tiffany's views before making any decisions with respect to such strategy or communicating with any Governmental Entity. Section 7.3 of the agreement further requires LVMH to keep Tiffany apprised of the status of regulatory approvals, and affords Tiffany the right to review information LVMH plans to submit to regulators. Neither LVMH nor Tiffany is permitted to "participate in any material discussions or meetings with any Governmental Entity" regarding approvals without consulting the other party and providing the other party the opportunity to attend and participate. *Id.*

61. These provisions imposed upon LVMH the obligation to gather and provide information, make the required filings, and to do everything within its power to

file for approvals as promptly as practicable and to receive regulatory rulings not only before the Outside Date, but also sufficiently in advance of the Outside Date to enable LVMH to meet its obligation to agree to and implement any remedies required after those filings to achieve clearance, and then close the deal.

62. The Merger Agreement set an Outside Date of August 24, 2020 but also granted either party the unilateral right to extend the Outside Date to November 24, 2020 in the event that the required regulatory approvals were the only outstanding condition to closing. On August 14, 2020, and again on August 24, 2020, Tiffany sent LVMH notice extending the Outside Date to November 24, 2020. LVMH responded by disputing Tiffany's right to extend the Outside Date. In connection with its supposed reservation of rights, LVMH has referenced a purported MAE and reserved an imagined right to terminate the Merger Agreement. No such termination right exists under the Merger Agreement.

*2. LVMH's Obligation to Close*

63. As a condition to closing, Section 8.2(d) of the Merger Agreement requires that, between the signing of the Merger Agreement and the Closing Date, "there shall not have occurred any" MAE. *Id., § 8.2(d)*. The Merger Agreement defines an MAE in relevant part as any event that:

> (a) has had or would be reasonably expected to have a material adverse effect on the business, condition (financial or otherwise), properties, assets, liabilities (contingent or otherwise), business operations or results of operations of the Company and its Subsidiaries, taken as a whole or (b) would or would reasonably be expected to prevent, materially delay or materially impair the ability of the Company *[i.e.,* Tiffany] to consummate the Merger or to perform any of its obligations under this Agreement by the Outside Date.

64. Significantly, however, the Merger Agreement explicitly excludes from the definition of MAE in clause (a) several categories of events, including "changes or conditions

22

generally affecting the industries in which the Company and any of its Subsidiaries operate," "general economic or political conditions (including U.S.-China relations), commodity pricing or securities, credit, financial or other capital markets conditions," "any change in Law applicable to the Company's business," "geopolitical conditions" and "the outbreak or escalation of hostilities (including the Hong Kong protests and the "Yellow Vest" movement)," except to the extent that any of these effects has a "materially disproportionate adverse effect" on Tiffany "relative to others in the industries and geographical regions in which affected businesses of the Company and its Subsidiaries operate in respect of the business conducted in such industries and applicable geographical regions."

65. Accordingly, to assert an MAE based on the COVID-19 pandemic, LVMH would have to show that the magnitude and duration of the pandemic's effects on Tiffany rose to the level of an MAE. The Merger Agreement also expressly excludes from the definition of MAE in clause (a) "any failure, in and of itself, by [Tiffany] to meet any internal or published" financial projections or forecasts.

66. While clause (b) includes within the definition of an MAE events or occurrences that impair *Tiffany's* ability to consummate the merger, no similar excuse is available to LVMH. As a result, events that might prevent LVMH from performing any of its obligations under the Merger Agreement by the Outside Date do not qualify as an MAE.

67. Equally important, the Merger Agreement does not include a *force majeure* clause or any other provision giving LVMH a unilateral option to terminate the transaction (whether by paying a termination fee or otherwise) absent a material breach by Tiffany. The Merger Agreement also does not include any financing contingencies. Although either party may terminate the Merger Agreement if the Merger is not closed by the Outside

Date, that right is not available to LVMH where LVMH's breaches are "the principal cause of, or directly resulted in, the failure of the Closing to occur by the Outside Date."

C.   *LVMH's Initial Steps to Pursue Prompt Antitrust Clearance and Closing.*

68. As soon as the Merger Agreement was signed, LVMH insisted that the parties push forward immediately and aggressively to clear all conditions to closing. The parties thus promptly prepared and filed on January 3, 2020 the merger clearance notification in the United States with the Federal Trade Commission and the Department of Justice. On February 3, 2020, the applicable waiting period under the United States antitrust laws expired without further inquiry or action from United States antitrust regulators. As a result, the merger has been cleared in the United States for more than seven months.

69. At the same time, LVMH insisted that Tiffany accelerate the preparation and filing of its proxy statement and expedite convening a stockholder meeting to obtain stockholder approval of the transaction. Tiffany filed a preliminary proxy statement on December 18, 2019 and its final merger proxy statement on January 6, 2020, in advance of a February 4, 2020 stockholder meeting. At the stockholder meeting, 99.3% of the votes cast (representing more than 71% of all outstanding Tiffany shares) approved the merger. In a press release issued by LVMH that same day, Arnault applauded the approval as a "significant milestone" and reiterated his commitment to acquiring "an iconic company" and "globally recognized symbol of love":

> This approval is a significant milestone as we move closer to completing our acquisition of Tiffany, an iconic company with a rich heritage and unique positioning in the global luxury jewelry market. A globally recognized symbol of love, Tiffany will be an outstanding addition to our unique portfolio of luxury brands. We look forward to welcoming Tiffany into the LVMH family and helping the brand reach new heights as an LVMH *Maison.*

In the same February 4 press release, LVMH represented that "[t]he transaction is still expected to close in the middle of 2020."

70. Before completely reversing field in order to negate the Merger Agreement, LVMH initially pressed forward in seeking the required regulatory clearances in other required jurisdictions beyond the United States. There are typically several stages to this process in each jurisdiction. For example, in the EU, the process for obtaining antitrust clearance from the EC involves first filing a Case Team Allocation Request ("CTAR"), which LVMH submitted to the EC promptly on November 26, 2019. The next step is filing with the EC a draft Form CO, the EU's merger notification form. After the draft Form C0 is filed, the EC and the parties engage in informal discussions during the "pre-notification process." At the conclusion of the pre-notification process, the parties formally notify the EC of the transaction, which involves filing the finalized Form CO. For a transaction without substantive antitrust concerns, the filing of the finalized Form CO typically results in clearance from the EC within 25 business days.

71. On December 12, 2019, LVMH proposed to Tiffany that LVMH submit the draft Form CO to the EC in the second half of January 2020 and file the final Form CO in the second half of February 2020. LVMH reiterated this proposed timetable in a submission to the EC the next day. During a December 16, 2019 meeting with the EC case team assigned to the transaction, LVMH suggested that its proposed timeline could result in EC clearance by the end of March 2020.

72. Tiffany worked diligently to facilitate antitrust clearance and requested that LVMH agree to specific deadlines and timetables for regulatory filings. On December 18, 2019, LVMH told Tiffany that defendants agreed with the goal of achieving final clearances in all relevant jurisdictions as soon as possible and in any event in the first half of 2020. The

25

following day, Tiffany's counsel noted that LVMH's stated goal was too vague to satisfy Tiffany's internal and external reporting requirements, and instead proposed specific, and feasible, timelines for antitrust filings and clearances for each jurisdiction based on prior experience with similar filings.

73. For the EU, Tiffany and LVMH agreed to file the draft Form CO with the EC in January. Given the EC case team's feedback during a December 16, 2019 meeting, Tiffany estimated that pre-notification discussions would take three to four months, which would result in a formal filing between April and May 2020 with final clearance from the EC by May or June 2020. LVMH's counsel responded that Tiffany's "timing estimates generally make sense to us, though it will ultimately very much depend on the data collection process, including from Tiffany."

D.   *The Emergence of the Covid-19 Issue*

74. As January 2020 progressed, COVID-19 spread rapidly. By January 30, 2020, the World Health Organization categorized COVID-19 as a Public Health Emergency of International Concern. In response, LVMH took advantage of favorable market conditions and stimulus efforts by the European Central Bank prompted by COVID-19 to secure cheap financing for the transaction. On February 5, 2020, LVMH announced that it was issuing more than $10 billion in new debt to help finance the acquisition (notwithstanding that obtaining financing was not a condition to closing under the Merger Agreement). According to press reports, LVMH's debt offering was the largest issuance of corporate bonds since 2016, and LVMH was able to lock in the financing "cheaper than Bernard Arnault's wildest hopes," with portions of the bonds placed at negative yields, meaning investors are paying single A-rated LVMH to borrow money.

75. Energized by its success in raising unexpectedly cheap financing, LVMH briefly continued to press forward with the regulatory clearance process. For example, on February 11, 2020, LVMH's counsel provided Tiffany with an initial draft of portions of the Form CO. Tiffany's counsel provided comments on those portions on a rolling basis, starting the very next day (February 12). LVMH's counsel provided a near-final version of the draft Form CO on February 27, and asked Tiffany's counsel to prioritize commenting on the Form CO, expressing hopes of "obtaining Tiffany's signoff this week if possible." Consistent with LVMH's request and its continued efforts to facilitate EC clearance, Tiffany's counsel provided additional comments on a rolling basis starting that same day. Even though LVMH's February 27 draft contained 57 pages of new material, Tiffany provided all remaining comments and signed off on submission of the draft Form CO in less than a week. LVMH filed the draft Form CO with the EC on March 4, 2020. Based on the parties' agreed projections, this should have triggered a three- to four-month period of pre-notification discussions, followed by a formal filing between early June and early July 2020, resulting in EC clearance by early July or (at the latest) early August 2020.

76. By this time, the effects of COVID-19 had started rippling through Europe and the United States. The United States reported its first death on February 29, 2020, and by March 9, 2020, the WHO reported 3,993 new daily cases. On March 13, 2020, President Trump declared COVID-19 a national emergency and announced a ban on non-U.S. citizens traveling from Europe to the United States, one of the first major signs of restrictions on movement that ultimately would cripple the global travel industry and significantly affect the retail space in which both LVMH and Tiffany operate.

77. On or about March 14, 2020, in response to pandemic-related governmental edicts, many of which banned non-essential shopping and in the interests of the safety of its staff and customers, Tiffany started to close many of its European stores, including all stores in Italy, Spain and France as well as stores in Brussels, Prague and Vienna. Significantly, LVMH did as well, as did retailers across the industry.

78. Starting the week of March 16, 2020, in the midst of the COVID-19 pandemic's spread and as part of a market-wide downturn, Tiffany's shares began trading at a significant discount to the Merger Agreement's agreed-upon acquisition price of $135 per share. When Tiffany closed all of its North American and British stores starting on or about March 18, 2020, Tiffany's stock traded as low as $104 per share, a price 23% lower than the agreed-upon acquisition price of $135 per share.

79. In response to these developments, LVMH again attempted to take advantage of the global pandemic to reduce its costs in acquiring Tiffany. On March 17, 2020, LVMH approached Tiffany's Board to inquire about a waiver of the Confidentiality Agreement's standstill provision that would allow LVMH to purchase Tiffany shares in the open market at a significant discount to the merger price. After rumors of LVMH's plans began circulating in the press—and after Tiffany explained that any waiver would have to be disclosed publicly—LVMH issued a press release on March 23, 2020, stating that "[t]hese rumors lead LVMH to recall that, in accordance with the agreement concluded with Tiffany in November 2019, LVMH is currently committed not to buy Tiffany." In issuing this press release, LVMH apparently did not recall its request to Tiffany's Board less than a week earlier for relief from that same standstill provision.

80. Upon information and belief, LVMH was steadily drafting a strategy which cited the pandemic as a means for LVMH to radically alter the Merger Agreement or destroy it. Arnault reconsidered his commitment to the transaction – at least at the agreed-upon price in the Merger Agreement. This negative strategy manifested itself in a dramatic slowdown of LVMH's efforts to obtain clearance in the EU and other jurisdictions. In effect, LVMH decided to sabotage the antitrust-clearance processes in flagrant breach of its contractual obligations.

81. As the COVID-19 pandemic began adversely affecting retail markets around the globe, LVMH abandoned its aggressive push toward obtaining antitrust clearances, and instead began delaying the regulatory processes on all fronts. Most egregiously, LVMH took *more than three months* to respond to the EC's first RFI (issued on March 19, 2020), a relatively straightforward set of initial information requests that could have been disposed of within weeks. LVMH repeatedly blamed this inexplicable delay on LVMH's organizational structure and related inefficiencies exacerbated by the COVID-19 pandemic, but neither excuse justified LVMH's protracted delays, which were designed to manufacture a purported termination right under the Merger Agreement.

82. By May or June 2020, LVMH affirmatively determined as part of its new corporate strategy to renege on or renegotiate the Merger Agreement, abandoning entirely its contractual obligation to file and secure antitrust approvals as promptly as practicable. LVMH's delaying tactics have put the parties in the unjustifiable position of being months past the expected mid-2020 closing date and less than three months from the extended Outside Date.

83. On March 23, 2020 – the same day LVMH announced that it would pass on purchasing Tiffany stock in the open market – LVMH's counsel canceled a standing weekly

antitrust clearance call in which LVMH's and Tiffany's lawyers were supposed to address outstanding antitrust issues. LVMH's counsel also proposed dispensing with future weekly calls entirely, suggesting instead that LVMH and Tiffany have "as-needed conferences for the RFIs that require them." Instead of maintaining open channels of communication, LVMH went dark, and not a single "as-needed conference" was held for more than a month.

84. During the initial post-signing period, LVMH had insisted on frequent personal meetings and telephone calls among the most senior management at LVMH and Tiffany. These included more than a dozen in-person meetings and telephone calls between Tiffany's CEO Alessandro Bogliolo ("Bogliolo") and LVMH's Managing Director and Board member Antonio Belloni ("Belloni") in the first five or so months after the parties signed the Merger Agreement. As LVMH soured on its agreed-upon acquisition, LVMH ceased working cooperatively with Tiffany, relying instead on lawyers to explain LVMH's delays to Tiffany. In fact, the last conversation between Messrs. Bogliolo and Belloni occurred in early May 2020, despite Bogliolo's sending Belloni weekly update emails regarding Tiffany's business operations and repeatedly offering to discuss any issues

85. The reason for this change soon became apparent. In early June 2020, the press reported that "Arnault has been in talks with his advisors this week to identify ways to pressure Tiffany to lower the agreed deal price of $135 per share," including "considering whether he can argue that the New York-based company is in breach of its obligations under the merger agreement." Consistent with LVMH's extensive delays in responding to regulatory inquiries over the prior several weeks, the press also reported that Arnault had "been looking for ways since the coronavirus outbreak to renegotiate the takeover."

86. As part of this strategy, Arnault convened a meeting of LVMH's Board on June 2, 2020, the existence and contents of which were leaked to the press that same night. According to press reports, LVMH's Board reportedly sent the "clear message" that LVMH's management should use the COVID-19 pandemic and recent social-justice protests in the United States as excuses to pressure Tiffany to agree to reduce the merger price. LVMH's Board also reportedly discussed ways to try to manufacture a claim that Tiffany somehow had breached the Merger Agreement by virtue of the manner in which Tiffany was conducting its business.

87. Given that LVMH could be the only source aware of the contents of its own Board's discussions, LVMH likely is responsible for leaking this information to the press, in violation of the Merger Agreement. After news of LVMH's Board meeting leaked, Tiffany's stock price dropped by more than 10% – perhaps one goal of LVMH's meeting and the subsequent leak.

88. Rather than reaffirming its intent to complete the transaction in response to these leaks, LVMH's only comment was a June 4, 2020 statement that essentially confirmed the press reports and offered a meaningless comment that LVMH did not intend to purchase Tiffany shares in the open market:

> The Board of Directors of LVMH Moet Hennessy Louis Vuitton, met on Tuesday, June 2nd, 2020 and notably focused its attention on the development of the pandemic and its potential impact on the results and perspectives of Tiffany & Co. with respect to the agreement that links the two groups. Considering the recent market rumors, LVMH confirms, on this occasion, that it is not considering buying Tiffany shares on the market.

89. Just a few days after LVMH's June 2 Board meeting, the press reported that "LVMH has decided it will not raise the issue of repricing the deal with Tiffany for now, after it considered the legal hurdles involved." Instead, LVMH cast aside the legal hurdles and redoubled its efforts to avoid in every manner possible the required regulatory approvals, in furtherance of LVMH's apparent overall strategy to find any way possible to avoid or renegotiate the Merger

31

Agreement. As part of this corporate strategy, LVMH's most senior business executives cut off almost all verbal communications with Tiffany, with LVMH instead resorting to incessant, seemingly accusatory written information requests from LVMH's General Counsel seeking improperly to bolster LVMH's renegotiation strategy. LVMH's goal in this new corporate strategy was to delay and prolong the antitrust-clearance processes as far into the future as possible in the illusory hope that some valid termination right might arise.

90. Although LVMH's delay in obtaining EC antitrust clearance may be the most egregious example of LVMH's breach of its obligation to prepare and file, "as promptly as practicable," all antitrust-clearance applications and to obtain, "as promptly as practicable," all antitrust clearances, LVMH also has breached its contractual obligations by delaying the antitrust-clearance process in other jurisdictions.

91. Almost immediately after signing the Merger Agreement, Tiffany and LVMH began a free-flowing and extensive exchange of information in furtherance of their – at the time – jointly shared goal of promptly closing the transaction and integrating the two companies' businesses. That close collaboration included an in-person meeting between senior management of Tiffany and LVMH (including Arnault), routine meetings and calls among senior management, the establishment of numerous working groups across different business units and, once the COVID-19 pandemic began to spread globally, weekly emails from Tiffany's CEO to LVMH's management regarding business operations and Tiffany's response to the pandemic. For more than six months, LVMH insisted upon, and appeared satisfied by, these channels of communication among business executives and the information Tiffany was providing.

92. LVMH's approach to these communications changed dramatically in May and June 2020, as Arnault asked his advisors to search for escape routes from the Merger Agreement

and LVMH's Board directed management to try to renegotiate the Merger Agreement. In May 2020, LVMH's Managing Director and Board member, Belloni, cut off all communications with Tiffany's CEO. On June 2, 2020—the same day as LVMH's Board meeting – Belloni also cut off communications with Tiffany's Chairman. This corporate cold shoulder was part of LVMH's new corporate strategy of seeking an escape from the Merger Agreement. LVMH's abrupt change of tactics included backing away from the parties' cooperative communications in favor of a pretextual letter-writing campaign by LVMH's General Counsel repeatedly demanding that Tiffany produce immediately vast swaths of information on a broad set of topics.

E.    *The Absence of Any MAE Attributable to Tiffany*

93. LVMH's correspondence with Tiffany – and LVMH's Board discussions leaked to the press—reflect that LVMH has been intently focused on trying to find ways to use the COVID-19 pandemic and social-justice protests in the United States as excuses to renegotiate or escape the Merger Agreement. But the impact of these events on Tiffany does not even come close to qualifying as an MAE under the Merger Agreement. Arnault announced at the outset of this transaction that LVMH's acquisition of Tiffany was a "centuries"-long investment. His attempt to avoid LVMH's obligation to close the deal based on a temporary industry decline is supported by nothing.

94. LVMH agreed to a narrowly defined MAE clause in the Merger Agreement that clearly excludes from the definition of MAE any effects from the COVID-19 pandemic and social justice protests in the United States, except to the extent that those events have had a materially disproportionate adverse effect on Tiffany relative to the industries and geographical regions in which Tiffany operates. Tiffany has not experienced *any* disproportionate adverse

effects from these events relative to the industries and geographical regions in which it operates, much less a *materially* disproportionate adverse effect.

95. Although temporary store closures caused by the COVID-19 pandemic had a substantial impact on Tiffany's financial performance in its first fiscal quarter ended April 30, 2020, the effects of the pandemic on Tiffany's business have not been significant in duration. After suffering a loss in its first fiscal quarter of 2020, Tiffany swung back to a profit in the second quarter and expects to see continuing financial improvement for the remainder of 2020 and beyond. More than 96% of Tiffany's stores worldwide have reopened for business, and Tiffany's e-commerce platform is outperforming expectations—in fact, Tiffany's e-commerce sales for its second fiscal quarter of 2020 increased 123% over the prior year.

96. As its more recent financial results make clear, Tiffany's business is recovering more quickly than even Tiffany had projected just a few months ago. For example, Tiffany's *actual* net sales in its second fiscal quarter of 2020 (May 1, 2020 through July 31, 2020) were more than 40% greater than Tiffany's June 2020 projection for that same period. Tiffany's latest forecasts similarly show a short-term impact from COVID-19, consistent with Tiffany's rapid recoveries after other market shocks like the September 11 attacks and the 2008 financial crisis. Having already returned to profitability after just one quarter of loss, Tiffany's most recent forecast—which has been shared with LVMH—projects that Tiffany's net earnings and earnings per share for its fourth fiscal quarter of 2020 will be *greater than the same period in 2019*, demonstrating a rapid return to (and surpassing of) Tiffany's pre-pandemic performance. Other LVMH-owned luxury brands have expressed similar views regarding the short-term impact of COVID-19. For instance, Jean-Christophe Babin, CEO of LVMH-owned luxury jeweler Bulgari, recently stated that he is "very bullish" for the third and fourth quarters and "confident that over

a period of 24 months, we will have recovered most of what was lost during COVID," and further advised the market that "our business, it's never lost, it's more postponed" and that the COVID-19 pandemic "doesn't change our strategy an inch." The fact that Tiffany experienced just one quarter of loss, followed by what it expects to be just two quarters of lower-than-2019 profits before surpassing its pre-pandemic performance in the fourth quarter of 2020 cannot under any definition constitute an MAE.

97. Even if the COVID-19 pandemic's effects on Tiffany's financial performance were significant enough to qualify as an MAE (and they are not), the Merger Agreement explicitly carves out numerous categories of events from the definition of an MAE. These include "changes or conditions generally affecting the industries in which the Company and any of its Subsidiaries operates," "general economic or political conditions . . . in the United States or any foreign jurisdiction in which the Company or any of its subsidiaries operations," "any change in Law applicable to the Company's business," "geopolitical conditions" and "the outbreak or escalation of hostilities (including the Hong Kong protests and the 'Yellow Vest' movement)," except to the extent those events have "a materially disproportionate adverse effect" on Tiffany "relative to the industries and geographies in which Tiffany operates."

98. The COVID-19 pandemic has affected all luxury-goods retailers, including LVMH itself. If anything, Tiffany's financial results compare favorably with those of other firms in that industry. For example, Tiffany's sales for the period April 1 through June 30, 2020 were down 43% year-over-year, less than the declines for luxury competitors Richemont (-47%) and Kering (-43.7%), and similar in magnitude to LVMH's own decline in sales for that same period (-38%).[34] And since the beginning of June, Tiffany's performance has outstripped even its own projections.

99. Given Tiffany's resilient performance in the face of the COVID-19 pandemic and other events, there has not been a material adverse effect on Tiffany's business, much less an MAE as that term is narrowly defined in the Merger Agreement. LVMH's suggestion that it has the ability to reject Tiffany's extension of the Outside Date and declare an MAE as of August 24, 2020 is baseless for another reason. Under the Merger Agreement, the question of whether an MAE has occurred is tested only in connection with closing, not months earlier as part of an effort to extract a price cut.

100. Despite facing significant uncertainties stemming from the COVID-19 pandemic, Tiffany has complied in all material respects with the Interim Operating Covenants, which in relevant part require Tiffany to "conduct its business in all material respects in the Ordinary Course of Business." LVMH never suggested otherwise, even after LVMH decided to change its corporate strategy and seek to renegotiate or renege on the Merger Agreement. LVMH raised this issue for the very first time on September 8, 2020 (without providing details) as part of a last-ditch effort to justify its unwillingness to comply with its contractual obligations.

101. Like other retailers, Tiffany has taken reasonable measures to manage its business and mitigate the effects of COVID-19. Tiffany has attempted to coordinate closely with LVMH on these efforts, including by discussing temporary store closures, real estate negotiations and personnel matters. In many cases, Tiffany has taken an identical approach to LVMH. Tiffany's actions in the face of these events – for example, allowing employees to work from home where feasible and implementing sanitization protocols in its retail locations – are all commercially reasonable steps that other similarly situated companies are taking in the ordinary course of their businesses.

102. Beyond temporary store closings, the other temporary changes implemented in response to the COVID-19 pandemic, such as implementing store sanitization procedures and requiring that personnel and customers wear face masks, are immaterial to Tiffany's overall business. By carefully managing its employees, business and vendors, Tiffany has not experienced any material supply-chain disruptions or difficulties as a result of the COVID-19 pandemic. Indeed, Tiffany's production facilities already have resumed full operation, and Tiffany has begun increasing staffing in light of demand projections.

103. Tiffany also has maintained its strong financial position. Tiffany's cash on hand at the end of its second quarter ($1.044 billion) was essentially unchanged from the prior quarter ($1.059 billion), and has continued to increase, totaling $1.170 billion as of the week ending August 21, 2020. Tiffany has maintained this strong cash position while continuing to declare and issue its regular quarterly dividends, as expressly permitted – and in fact, required – by the Merger Agreement.

F.   *The Hoax of LVMH's Procuring Government Letters*

104. On September 8, 2020, during a telephone call that LVMH's Managing Director, Belloni, specifically requested with Tiffany's Chairman, Roger Farah, LVMH disclosed for the first time that it had received a letter from the French Ministry for Europe and Foreign Affairs on August 31, 2020. LVMH provided no explanation for its failure to share this letter with Tiffany for eight days.

105. According to a purported English translation provided by LVMH, the letter states that the French Ministry for Europe and Foreign Affairs is opposed to certain tariffs on French goods that the U.S. government announced on July 10, 2020 (but deferred until January 6, 2021). As part of the Ministry's analysis of the impact of those tariffs on French investments, the French Secretary of State's "attention was drawn to" LVMH's "pending acquisition of

37

Tiffany." Appealing to LVHM's patriotism as a French company, the letter states that LVMH "should defer the closing of the pending Tiffany transaction until January 6, 2021" to support France's intention to "take measures in order to dissuade the American authorities from putting these tariff sanctions into effect."

106. During this September 8 call, Belloni disclosed that LVMH had been considering the French Foreign Ministry's letter for several days, and that Arnault already had met with the French Secretary of State to discuss the issues raised in the letter. LVMH's actions are clear breaches of LVMH's obligations under the Merger Agreement to keep Tiffany apprised of the status of matters relating to the completion of the transaction, to promptly provide Tiffany with copies of material communications from governmental entities regarding the transaction and to consult with Tiffany and consider in good faith Tiffany's views before making any decisions regarding regulatory strategy or meeting with any governmental authorities regarding any inquiries concerning the transaction.

107. Belloni also added that LVMH's Board had met to discuss the French Foreign Ministry's letter and other issues related to the pending Tiffany acquisition, including that Tiffany had not acquiesced to LVMH's recent efforts to renegotiate the merger price. Belloni falsely stated that LVMH continued to believe that an MAE had occurred (notwithstanding Tiffany's strong financial performance in its most recently completed fiscal quarter and its current quarter to date and—for the first time—expressed the view that Tiffany has not operated its business in accordance with the Merger Agreement. Despite Farah's requests, Belloni refused to provide any details to support either position.

108. Belloni further informed Farah that LVMH intends to comply with the French Foreign Ministry's request that LVMH refuse to close the transaction before January 6, 2021. In

38

essence, Belloni made clear that LVMH is unwilling to comply with its obligations under the Merger Agreement and has unilaterally renounced it.

109. LVMH's actions surrounding its disclosure of the French Foreign Ministry's letter further confirm that LVMH is not acting in good faith to comply with the Merger Agreement. LVMH's unexplained delay in disclosing the existence of the French Foreign Ministry's letter is consistent with LVMH's pattern of delay and obfuscation, and LVMH's unilateral and entirely improper contact with the French government represents a further escalation of LVMH's stalling tactics and a breach of its obligations under the Merger Agreement.

## Count I

### [For Violations of the Anti-Fraud Provisions of the Federal Securities Laws]

110. Plaintiffs repeat and reallege each and every allegation of §§ 1-109, *supra*.

111. As previously alleged, each of the defendants has engaged in fraudulent acts and schemes, and fraudulent failures to act that have violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

112. By reason of the foregoing, defendants have damaged plaintiffs in an amount to be determined at trial but believed to exceed $10 million.

## Count II

### [For Violation of Section 20(a) of the Exchange Act]

113. Plaintiffs repeat and reallege each and every allegation of §§ 1-112, *supra*.

114. Defendants Arnault and Guiony acted as controlling persons of the corporate defendants within the meaning of Section 20(a) of the Exchange Act. By virtue of their executive positions, the individual defendants had the power to influence and did influence and control the conduct of the corporate defendants.

115. By reason of the foregoing, Arnault and Guiony have damaged plaintiffs in an amount to be determined at trial but believed to exceed $10 million.

WHEREFORE, plaintiffs demand judgment as follows:

• On Count I, in an amount to be determined at trial but believed to exceed $10 million;

• On Count II, in an amount to be determined at trial but believed to exceed $10 million; and

• Such other relief as the Court deems just and proper.

Dated: New York, New York
September 28, 2020

PAUL BATISTA, P.C.

By: _____
Paul Batista
Attorney for Plaintiffs Lucien Selce,
Drexel, Morgan & Co., Inc.,
and Fairmont Capital Ltd.
26 Broadway – Suite 1900
New York, NY 10004
(631) 377-0111
Batista007@aol.com